**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Kemp, | No. CV-00-50-TUC-FRZ |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| Dora B. Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

Petitioner Thomas Kemp filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced in violation of the United States Constitution.  (Dkt. 19.)[1]  In an Order dated April 22, 2005, the Court dismissed a number of claims as procedurally barred, not cognizable, unripe, or meritless. (Dkt. 78.)  The Court subsequently denied Claims 3, 6, and 12 on the merits.  (Dkt. 112.)

The following claims are before the Court and have been fully briefed:  1, 2, 4, 5, 7-11, and 16.  (*See* Dkts. 80, 88, 97.)

---

[1]     "Dkt." refers to documents in this Court's file.  "ROA" refers to the record from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-93-332-AP).  "ME" refers to the minute entries of the trial court.  "RT" refers to the court reporter's transcripts.  Original reporter's transcripts and certified copies of the appellate and post-conviction records were provided to this Court by the Arizona Supreme Court.  (*See* Dkts. 39, 40.)

The Court has considered the claims and concluded, for the reasons set forth herein, that Petitioner is not entitled to relief.

## BACKGROUND

On July 11, 1992, at approximately 11:15 p.m., Hector Juarez awoke when his fiancee, Jamie, returned from work to their residence at the Promontory Apartments in Tucson.[2]  A short time later, Juarez left to get something to eat.  Jamie assumed he went to a nearby fast food restaurant.

At around midnight, Jamie became concerned that Juarez had not come home and began to look for him.  She found both her car and his car in the parking lot.  Her car, which Juarez had been driving, was unlocked and smelled of fast food; the insurance papers had been placed on the vehicle's roof.  After checking with Juarez's brother and a friend, Jamie called the police.

Two or three days before Juarez was abducted, Jeffery Logan, an escapee from a California honor farm, arrived in Tucson and met with Petitioner.  On Friday, July 10, Logan went with Petitioner to a pawn shop and helped him buy a .380 semi-automatic handgun. Petitioner and Logan spent the next night driving around Tucson.  At some time between 11:15 p.m. and midnight, Petitioner and Logan abducted Juarez from the parking area of his apartment complex.

At midnight, Petitioner used Juarez's ATM card and withdrew approximately $200. He then drove Juarez out to the Silverbell Mine area near Marana.  Petitioner walked Juarez fifty to seventy feet from the truck, forced him to disrobe, and shot him in the head twice.

Petitioner then made two unsuccessful attempts to use Juarez's ATM card in Tucson. The machine kept the card after the second attempt.  Petitioner and Logan repainted Petitioner's truck, drove to Flagstaff, and sold it.  They bought another .380 semi-automatic handgun with the proceeds.

---

[2]      Except where otherwise noted, this background is based upon the facts set forth by the Arizona Supreme Court in *State v. Kemp*, 185 Ariz. 52, 55-56, 912 P.2d 1281, 1284-85 (1996).

While in Flagstaff, Petitioner and Logan met a man and woman who were traveling from California to Kansas.  They abducted the couple and made them drive to Durango, Colorado; in a motel room there, Petitioner forced the man to disrobe and sexually assaulted him.

Later, Petitioner, Logan, and the couple drove to Denver, where the couple escaped. Logan and Petitioner separated.  Logan subsequently contacted the Tucson police about the murder of Juarez.  He was arrested in Denver.

With Logan's help, the police located Juarez's body.  Later that day, the police arrested Petitioner at a homeless shelter in Tucson.  He was carrying the handgun purchased in Flagstaff and a pair of handcuffs.  After having been read his *Miranda* rights, Petitioner answered some questions before asking for a lawyer.  He admitted that he purchased a handgun with Logan on July 10.  He said that on the day of the abduction and homicide he was "cruising" through apartment complexes, possibly including the Promontory Apartments.  When confronted with the ATM photographs, he initially denied being the individual in the picture. After having been told that Logan was in custody and again having been shown the photographs, Petitioner said, "I guess my life is over now."

While awaiting trial, Petitioner twice made admissions to corrections officials.  He said that he was in protective custody because the person he killed was Hispanic.  He explained that the Hispanics in the jail were after him because they thought the crime was racially motivated, and that the white inmates would not protect him.

Logan was tried separately first, convicted, and sentenced to life imprisonment.

On June 7, 1993, a jury found Petitioner guilty of first-degree felony murder, armed robbery, and kidnapping.

At sentencing, the court found three statutory aggravating factors:  Petitioner had previously been convicted of a felony involving the use or threat of violence against a person; the murder was committed with the expectation of pecuniary gain; and the murder was committed in an especially heinous, cruel or depraved manner.  Finding no mitigating circumstances, the court sentenced Petitioner to death.

On direct appeal, the Arizona Supreme Court affirmed Petitioner's convictions and sentences. *See State v. Kemp*, 185 Ariz. 52, 912 P.2d 1281 (1996).  Petitioner filed a petition for postconviction relief (PCR) with the trial court on February 12, 1999; it was dismissed on May 13, 1999.  Petitioner then filed a Petition for Review to the Arizona Supreme Court, which was summarily denied on January 4, 2000.  Petitioner thereafter initiated these federal habeas proceedings.

## AEDPA STANDARD FOR RELIEF

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333 n.7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

1   of the holdings of the Supreme Court at the time the petitioner's state court conviction

2   became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649,

3   653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be

4   granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional

5   principle advanced by a petitioner, even if lower federal courts have decided the issue.

6   *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896,

7   907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit

8   court precedent may be "persuasive" in determining what law is clearly established and

9   whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

10   The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

11   The Court has explained that a state court decision is "contrary to" the Supreme Court's

12   clearly established precedents if the decision applies a rule that contradicts the governing law

13   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

14   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

15   indistinguishable from a decision of the Supreme Court but reaches a different result.

16   *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In

17   characterizing the claims subject to analysis under the "contrary to" prong, the Court has

18   observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

19   facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

20   clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

21   Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

22   may grant relief where a state court "identifies the correct governing legal rule from [the

23   Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

24   "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

25   where it should not apply or unreasonably refuses to extend that principle to a new context

26   where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's

27   application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

28   must show that the decision was not merely incorrect or erroneous but "objectively

1    unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

2         Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

3    court decision was based upon an unreasonable determination of the facts. *Miller-El v.*

4    *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

5    determination will not be overturned on factual grounds unless objectively unreasonable in

6    light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340

7    (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In

8    considering a challenge under § 2254(d)(2), state court factual determinations are presumed

9    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

10   convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El*

11   *II*, 545 U.S. at 240.

12                                    **DISCUSSION**

13   **I.     Guilt Stage Claims**

14         In these claims, Petitioner challenges the trial court's evidentiary rulings, the jury-

15   selection process, and his counsel's performance.  He contends that the state courts' rejection

16   of the claims entitles him to relief under § 2254(d).  In support of this contention, Petitioner

17   criticizes the Arizona Supreme Court's application of the harmless error standard and its

18   assessment of prejudice, which was based upon the court's determination that Petitioner's

19   "conviction is supported by overwhelming evidence of his guilt, including his own

20   statements to the police and corrections officers." *Kemp*, 185 Ariz. at 59, 912 P.2d at 1288.

21   Specifically, Petitioner repeatedly challenges the significance of his statements to the

22   corrections officers, characterizing them as "equivocal" and alleging that the Arizona

23   Supreme Court made an unreasonable factual determination when it found that Petitioner had

24   admitted his guilt to the officers. (*See, e.g.*, Dkt. 97 at 2-3, 14-16.)

25         Petitioner's arguments are not well taken.  His alternative interpretation of the

26   inculpatory statements is insufficient to overcome the presumption of correctness that applies

27   to the state court's finding under § 2254(e)(1).  The testimony of the corrections officers was

28   that Petitioner did not equivocate when he stated that the man he killed was Hispanic.  (*See*

RT 6/3/94 (p.m.) at 20, 29, 33, 35.)  The Court further notes that the Arizona Supreme Court's finding of harmless error is entitled to deference under § 2254(d)(1).[3] *Fry v. Pliler*, 127 S. Ct. 2321, 2326-27 (2007) (citing *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam)).  These principles inform the following analysis of the merits of Petitioner's guilt stage claims.

**Claim 1**

Petitioner alleges that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court admitted testimony of a "subsequent bad act" consisting of a sexual assault committed by Petitioner after the murder of Juarez. (Dkt. 80 at 9-16.) He further contends that he was prejudiced by the State's failure to disclose this testimony. (*Id.* at 16-18.)

Background

On December 4, 1992, Petitioner filed a motion for disclosure, seeking a list of prospective witnesses and a "list of all prior and subsequent acts which the prosecutor will use at trial." (ROA 95; *see* RT 12/14/92 at 2.) On December 28, 1992, the State filed its witness list, which included both victims of the subsequent bad acts (the couple kidnapped in Flagstaff). (ROA 99.) The State did not disclose the content of their testimony. On January 25, 1993, Petitioner filed a motion seeking disclosure of evidence, including hotel receipts and co-defendant Logan's clothing, pertaining to the subsequent bad act – i.e., "an alleged kidnapping regarding Mr. Kemp." (ROA 155.) The court granted the motion. (ME 2/8/93.)

At trial, the State sought to introduce evidence of the kidnapping, robberies, and sexual assault committed by Petitioner and Logan during their flight from Tucson. (*See* RT 6/2/93 at 177.) Petitioner filed a motion in limine to exclude evidence of prior or subsequent bad acts. (ROA 211-12.) The trial court granted the motion in part, barring the State from

---

[3]      Under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), trial error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."

presenting evidence of the kidnapping but allowing limited testimony regarding the sexual assault. (ME 6/2/93.) The court found that the forced sexual contact with the victim was "sufficiently relevant" given the fact that Juarez's body was found unclothed. (RT 6/2/93 at 203.)

Pursuant to the court's ruling, the male victim briefly testified that he and his female companion traveled together from Flagstaff to Durango, Colorado, where they involuntarily occupied a motel room with Kemp and Logan, both of whom were armed with guns. (RT 6/3/93 (p.m.) at 44-46.) There, against the victim's will, Petitioner touched his "privates" and "that was it." (*Id.* at 46.) He then testified that he and his companion were able to escape and contact the police. (*Id.* at 47.)

At the close of trial, the court provided the following limiting instruction:

> Evidence of other bad acts of the defendant has been admitted into evidence in this case. Such evidence is not to be considered by you to prove the character of the defendant or to show that he committed the offense charged. It may, however, be considered by you regarding the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(RT 6/4/93 at 74.)

<u>Analysis</u>

*Admission of "bad act" evidence*

On direct appeal, the Arizona Supreme Court first noted that the trial court erred by *excluding* evidence of the kidnapping and robbery, which was admissible "as evidence of flight showing consciousness of guilt." *Kemp*, 185 Ariz. at 59, 912 P.2d at 1288. The court then explained that the testimony concerning the sexual assault was "more problematic" but that its admission did not prejudice Petitioner:

> At trial, the State offered the sexual assault evidence to establish motive for the abduction of Juarez and to prove the identity of the person who killed him. On appeal, the State abandoned this rationale and argued that the evidence would have been properly admitted to show a common plan or scheme. Rule 404(b), Ariz.R.Evid.
>
> We need not consider the new theory, because even if there was error, it was harmless beyond a reasonable doubt. Kemp's conviction is supported by overwhelming evidence of his guilt, including his own statements to the police

and corrections officials.  After viewing the record in its entirety, we find beyond a reasonable doubt that the jury would have reached the same verdict if the evidence had been excluded.

*Id.*

In general, state law matters, including a trial court's evidentiary rulings, are not proper grounds for habeas corpus relief.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts properly consider it.  *See, e.g.*, *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States*, 493 U.S. 342, 352 (1990).  Pursuant to this narrow definition, the Court has declined to hold that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice.  *Estelle v. McGuire*, 502 U.S. at 75 & n.5; *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967).  Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting evidence of prior bad acts.  *See, e.g.*, *Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003) (state court decision allowing admission of evidence pertaining to petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that state violated due process by permitting propensity evidence in the form of other bad acts evidence).  Moreover, although "clearly established Federal law" under the AEDPA refers only to holdings of the United States Supreme Court, this Court notes that even under Ninth Circuit precedent Petitioner would not be entitled to relief.  The Ninth Circuit has held that the admission of "other acts" evidence violates due process only if  the evidence is "of such quality as necessarily prevents a fair trial." *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986); *see Mancuso v. Olivarez*,

292 F.3d 939, 956 (9th Cir. 2002) (writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings'") (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)).

Based upon these principles, it is clear that the admission of the contested evidence does not constitute a basis for habeas relief. First, there was no violation of clearly established federal law. Second, there was no due process violation because admission of the evidence did not render Petitioner's trial unfair; the contested testimony was limited in scope, reliable, and of minimal impact given the remaining evidence implicating Petitioner. In addition, the trial court mitigated any prejudicial impact by providing an appropriate limiting instruction. *See Dubria v. Smith*, 224 F.3d 995, 1002 (9th Cir. 2000) (cautionary instruction to the jury is ordinarily presumed to have cured prejudicial impact); *Walters v. Maass*, 45 F.3d at 1357-58.

Finally, even if a due process violation had occurred, Petitioner would not be entitled to relief. This Court, having undertaken its own harmless error review pursuant to *Brecht*, concludes that there is no probability, given the "overwhelming evidence" that Petitioner murdered Juarez, *Kemp*, 185 Ariz. at 59, 912 P.2d at 1288, that the verdict was affected by the sexual assault victim's limited testimony.

*Discovery violation*

The Arizona Supreme Court also rejected Petitioner's claim that he was entitled to relief based upon the State's allegedly untimely disclosure of the sexual assault, finding that defense counsel was sufficiently on notice of the issues involved so that any lack of disclosure was not prejudicial:

> Before trial, the court on two occasions ordered the State to disclose the bad acts it would use. *See* Rule 15.1(a)(6), Ariz.R.Crim.P. The State did disclose the victim of the subsequent homosexual assault as a possible witness approximately six months before trial. While it never provided Kemp with a list of his bad acts, Rule 15.1(a)(6) appears to apply to prior acts and not subsequent conduct. But even if Rule 15.1(a)(6) applies here, there simply was no prejudice.
> Discovery rulings are affirmed unless there is an abuse of discretion. *See State v. Krone,* 182 Ariz. 319, 321, 897 P.2d 621, 624 (1995). Kemp

1    argues that he was unable to obtain a fair and impartial jury and he was unable
2    to develop any impeachment or motive evidence against the victim of the
     subsequent homosexual assault.  We disagree.

3         First, the record is clear that Kemp's trial counsel was aware that
4    Kemp's homosexuality potentially would be placed before the jury.  Logan's
     statements to the police and media raised the issue.  In addition, Logan's trial
5    preceded Kemp's, and the witness Kemp sought to preclude testified regarding
     the same events at Logan's trial.  Furthermore, Kemp successfully suppressed
6    other evidence of his homosexuality, including sexually explicit photographs
     and a journal purportedly detailing his homosexual encounters.  Although
7    Kemp did not have a ruling regarding the bad act evidence prior to voir dire,
     he was clearly aware of the issue, was not surprised, and could have developed
     it at voir dire if he so wanted.
8
9         Second, Kemp's argument that he was unable to develop impeachment
     or motive evidence is without merit.  The only connection the witness had to
10   Kemp was the misfortune of being his kidnapping, robbery, and sexual assault
     victim.  The witness was listed approximately six months before Kemp's trial
11   and testified about the same events at Logan's trial.  There was no abuse of
     discretion.

12   *Kemp*, 185 Ariz. at 59, 912 P.2d at 1288.

13        As the state supreme court found, Petitioner was not deprived of a fair trial by the

14   State's failure to provide additional disclosure with respect to the sexual assault.  The State

15   disclosed the witness, and Petitioner was aware of the substance of his testimony.  Therefore,

16   the State did not prevent Petitioner from investigating the victim or the incident.  Moreover,

17   Petitioner has not suggested that such an investigation could have developed information

18   useful to the defense in its cross-examination of the witness.  *See James v. Borg*, 24 F.3d 20,

19   26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of

20   specific facts do not warrant habeas relief.").  Petitioner has not demonstrated that the alleged

21   discovery violation rendered his trial fundamentally unfair; therefore, his due process rights

22   were not violated.

23        For the reasons set forth above, Claim 1 is without merit and will be denied.

24   **<u>Claim 2</u>**

25        Petitioner alleges that he was denied his right to an unbiased jury.  (Dkt. 80 at 18-23.)

26   He first contends that the trial court's refusal to allow him to voir dire the jury panel

27   regarding potential homosexual bias violated his constitutional rights guaranteed by the Fifth,

28   Sixth, and Fourteenth Amendments.  He also argues that his due process rights were violated

1  by the "death qualification" of the jury.  (*Id.* at 22-23.)

2      Background

3      Defense counsel moved the trial court to provide him with a list of potential jurors,

4  allow him to submit a questionnaire to the jury, and permit attorney-conducted individual

5  voir dire of potential jurors.  (ROA 71-73.)  Although the trial court denied the motions,

6  several jurors were individually questioned.  (RT 6/2/93 at 36-39, 50, 54.)  Neither defense

7  counsel's proposed questionnaire nor any proposed oral questions addressed the issue of

8  homosexuality.

9      During voir dire, the trial court explained to the venire members that they could not

10  base their decision on guilt or innocence based on the possible imposition of the death

11  penalty:

12      Some of you may have feelings about the death penalty though that you cannot
       set aside and in deliberating in this case.  I don't know if any of you feel that
13      way or not.  But I need to know.  Some [sic] my question is, do any of you
       have personal feelings about the death penalty that you feel would interfere
14      with deciding this case only on the law and the evidence?  Raise your hand if
       you think that your feelings on the death penalty may interfere with deciding
15      the case impartially.

16  (RT 6/2/93 at 61.)  No juror responded.  (*Id.*)

17      Following voir dire, defense counsel requested the opportunity to further question a

18  juror who indicated that his father-in-law had been convicted of incest on the grounds that

19  evidence of homosexuality might trigger a strong response from the juror.  (*Id.* at 123-26.)

20  When questioned by the judge, the juror indicated that he would not be affected by that

21  aspect of his background.  (*Id.* at 128.)  The court denied counsel's motion to strike the juror,

22  and counsel passed the panel.  (*Id.* at 130-31.)

23      Subsequently, during discussions of the admissibility of evidence concerning the

24  subsequent sexual assault, defense counsel requested permission to re-voir dire the jury on

25  the issue of homosexuality.  (*Id.* at 203.)  Further voir dire did not take place.

26      Analysis

27      On direct appeal, the Arizona Supreme Court rejected Petitioner's challenges to the

28  jury selection process: "After reviewing the record, we are convinced that Kemp was tried

- 12 -

1    by a fair and impartial jury." *Kemp*, 185 Ariz. at 63, 912 P.2d at 1292.  Specifically, the

2    court held that Petitioner "had the opportunity [to question jurors about their attitudes on

3    homosexuality] and elected not to take it."  *Id.*  The court also "summarily reject[ed]"

4    Petitioner's claim that his right to an unbiased jury was violated by the trial court's death-

5    qualification questions.  *Id.*

6                    *Voir dire regarding homosexuality*

7            Petitioner contends that the trial court's failure to inquire, or to allow inquiry, into the

8    jurors' beliefs concerning homosexuality prevented the empaneling of an unbiased jury and

9    violated his equal protection rights.[4]  (Dkt. 80 at 20-22.)

10           A defendant is entitled to "a fair trial by a panel of impartial, indifferent jurors," which

11   includes "an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S.

12   719, 727, 729 (1992).  However, "[t]he adequacy of *voir dire* is not easily the subject of

13   appellate review," *id.* at 730, and "the trial court retains great latitude in deciding what

14   questions should be asked on *voir dire*," *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991); *see*

15   *Ristaino v. Ross*, 424 U.S. 589, 594 (1976).  "The Constitution does not always entitle a

16   defendant to have questions posed during *voir dire* specifically directed to matters that

17   conceivably might prejudice him," *Ristaino*, 424 U.S. at 594, but a state court's refusal to

18   pose "constitutionally compelled" questions merits habeas relief, *Mu'Min*, 500 U.S. at 424-

19   26.

20           Specific voir dire questioning is constitutionally compelled in limited circumstances.

21   Inquiry into racial prejudice is required in capital cases involving interracial crimes, *see*

22   *Turner v. Murray*, 476 U.S. 28, 36-37 (1986), and when issues of race are "inextricably

23

24   _____

25           [4]       Petitioner also asserts, contrary to the finding by the Arizona Supreme Court,
     that he was unaware that homosexuality would be an issue at trial until after the jury had
26   been selected, when the court ruled on the admissibility of the sexual assault victim's
     testimony.  (*See* Dkt. 97 at 21.)  As explained in this Court's analysis of Claim 1, the record
27   plainly shows that prior to voir dire the defense was on notice that the sexual assault victim
     was a potential witness whose testimony would address the subsequent bad act.
28

bound up with the conduct of the trial," *Ristaino*, 424 U.S. at 597.[5]  By contrast, there is no clearly established law requiring that jurors be questioned about possible bias against homosexuals.  *Cf. Healy v. Spencer*, 453 F.3d 21, 29 n.9 (1st Cir. 2006) (declining to suggest that voir dire on the question of homosexuality is constitutionally mandated).  Therefore, Petitioner is not entitled to relief under § 2254(d)(1).  *See Williams*, 529 U.S. at 365; *Musladin*, 127 S. Ct. at 653-54 (denying habeas relief in absence of clearly established federal law).

Even assuming the existence of Supreme Court precedent applying the same voir dire requirements with respect to issues of race and sexuality, such voir dire was not required in Petitioner's case because the sentencing was not carried out by the jury but by the trial judge.  In *Turner v. Murray*, the Supreme Court held that a capital defendant accused of an interracial crime is entitled to voir dire on the issue of racial prejudice because the "range of discretion entrusted to a jury in a capital sentencing hearing" provides "a unique opportunity for racial prejudice to operate but remain undetected."  476 U.S. at 35.  The Court explained that the same concerns do not operate "when the jury is restricted to factfinding" at the guilt stage of trial.  *Id.* at 36 n.8.  Thus, the Court vacated Turner's death sentence but not his guilty verdict.  *Id.* at 37.

The concerns which led the *Turner* Court to find that questions regarding racial prejudice are constitutionally compelled are absent when, as in Petitioner's case, the jury is not the sentencer.  Therefore, even if the holding in *Turner* applied equally to questions of sexual and racial bias among potential jurors, Petitioner was not constitutionally entitled to voir dire on the subject of homosexuality because the jury did not participate in the sentencing proceedings.

Additionally, Petitioner's homosexuality was not "inextricably bound up with" his

---

[5]      In addition, questions regarding a juror's views on capital punishment are constitutionally mandated in capital cases when a jury is responsible for sentencing.  *See Morgan*, 504 U.S. at 730.

1   case to the extent that specific inquiry into the issue of homosexuality was required.

2   *Ristaino*, 424 U.S. at 597.  As an example of a case where racial issues were inextricable

3   from the conduct of the trial, the *Ristaino* Court cited *Ham v. South Carolina*, 409 U.S. 524

4   (1973).  *Id.  Ham* involved a black defendant charged with a drug offense whose defense was

5   that law enforcement officers framed him in retaliation for his widely known participation

6   in civil rights activities.  409 U.S. at 525-26.  The Court held that the Fourteenth Amendment

7   required the judge to interrogate the jury panel on the subject of racial prejudice.[6]  409 U.S.

8   at 527.  In the present case, the issue of homosexuality was not bound up with the defense;

9   nor did the trial involve allegations of homosexual prejudice.  Therefore, even if the holdings

10  in *Ristaino* and *Ham* extended to potential bias based on sexual orientation, they would not

11  entitle Petitioner to relief on this claim.

12      Finally, Petitioner has not shown that the lack of voir dire on the issue of

13  homosexuality rendered his trial "fundamentally unfair."   *Mu'Min*, 500 U.S. at 425-26.

14  Petitioner's assertion that he "clearly suffered prejudice due to his inability to determine and

15  explore the extent of homosexual bias among the jurors" (Dkt. 97 at 22) is not supported by

16  even the suggestion that any of the jurors was biased.  As previously stated, conclusory

17  allegations not supported by specific facts do not merit habeas relief.  *James v. Borg*, 24 F.3d

18  at 26; *see also United States v. Mendoza*, 157 F.3d 730, 734 (9th Cir. 1998) (defendant not

19  entitled to relief on appeal because he "presented no evidence that any of the jurors that

20  found him guilty were unable or unwilling to properly perform their duties").

21      *Death qualification*

22      Petitioner contends that the death-qualification process violated his rights because in

23  Arizona at the time of his conviction the judge, not the jury, determined a capital defendant's

24  sentence.  (Dkt. 80 at 22-23.)

25      Clearly established federal law holds that the death-qualification process in a capital

26

27      [6]   The Court rejected the defendant's contention that he was constitutionally
28  entitled to inquire whether the jurors harbored prejudiced against people with beards.  *Ham*,
    409 U.S. at 527-28.

case does not violate a defendant's right to a fair and impartial jury. *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Furman v. Wood*, 190 F.3d 1002, 1004-05 (9th Cir. 1999) (no due process violation where defendant who was not actually eligible for death penalty was tried by death-qualified jury); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death qualification of Arizona jurors not inappropriate). Because Petitioner's position is not supported by clearly established federal law, in the form of United States Supreme Court precedent, the decision of the Arizona Supreme Court denying the claim cannot form the basis for federal habeas relief. *See Williams*, 529 U.S. at 365; *Musladin*, 127 S. Ct. at 653-54.

For the reasons stated above, Petitioner is not entitled to relief on the allegations contained in Claim 2.

**Claim 4**

Petitioner alleges that his Confrontation Clause rights were violated when the trial court admitted co-defendant Logan's hearsay statements. (Dkt. 80 at 27-29.)

Background

Logan asserted his Fifth Amendment right not to testify at Petitioner's trial. (RT 6/2/93 at 5-7.) Subsequently, Detective Salgado testified about his interview of Petitioner. (RT 6/3/93 (p.m.) at 50.) Detective Salgado indicated that Petitioner agreed to answer some questions. (*Id.*) In the course of the interview, Petitioner made several incriminating remarks. He acknowledged that he had "separated" from his white truck in Flagstaff. (*Id.* at 52-53.) He stated that on Friday, July 10, 1992, accompanied by Logan, he purchased a gun at a pawnshop in Tucson, after which they went out for target practice. (*Id.* at 54-56.) Petitioner then admitted that on Saturday, July 11, he and Logan, who had been together a "majority" of the time since Thursday, cruised around Tucson, visiting certain apartment complexes; according to Petitioner, there was "a very good possibility" that one of the locations they visited was the complex where Juarez lived. (*Id.* at 61.) Petitioner also stated, when confronted with Detective Salgado's insistence that Petitioner was the person depicted

1   in the ATM photograph, "I know you guys aren't stupid." (*Id.* at 58.)   Finally, when

2   informed that Logan was also in custody, Petitioner responded, "I guess my life is over now."

3   (*Id.* at 59.)

4          While cross-examining Detective Salgado, defense counsel asked a series of questions

5   about the strength of the evidence against Petitioner. (*Id.* at 68-69.) Detective Salgado

6   conceded that there was no physical evidence, other than the "fuzzy" bank photo, implicating

7   Petitioner, as opposed to Logan, as the killer. (*Id.* at 69.) Counsel then asked:

8          Q:    There is no evidence that Kemp had possession of the gun that killed
                 Hector [Juarez] at any time after the purchase?
9
10         A:    No.

11         Q:    And in fact, the only evidence you have got of what happened to that
                 gun is it was used to kill Hector and Jeff Logan had it; no evidence
                 Thomas Kemp was in the Silverbell Mines area that night, is there?
12
13         A:    No.

14         Q:    There is no evidence that Thomas Kemp knew?

15         A:    No.

16         Q:    There is no evidence that Thomas Kemp was at the scene where the
                 body was found at all?
17
           A:    No.

18   (RT 6/3/93 at 69.)

19         The prosecutor did not object to the questions.   However, on redirect examination, he

20   attempted to question Detective Salgado about Logan's statement, and defense counsel raised

21   a hearsay objection. (*Id.* at 71-72.) Outside the jury's presence, the prosecutor argued that

22   the defense had opened the door to the testimony to rebut the misleading impression that no

23   evidence connected Petitioner to the murder weapon or the location of the body, when, in

24   fact, Logan's statement to Detective Salgado provided such a link. (*Id.* at 74–77.) Following

25   a lengthy discussion, the trial court explained to defense counsel that he could not have it

26   "both ways," leaving the jury with "inaccurate impressions" and precluding the State from

27   challenging those impressions. (*Id.* at 80-81.) The court ruled that the State would be

28   permitted to elicit testimony from Detective Salgado to the effect that "no evidence"

1   implicating Petitioner meant "things other than statements made by Logan." (*Id.* at 81-82.)

2   The court did not permit the State to elicit Logan's statements that Petitioner shot Juarez or

3   to explain how Logan knew where the body was located. (*Id.* at 80-83.) Thereafter,

4   Detective Salgado briefly testified that he had interviewed Logan, that Logan indicated that

5   he had been in Tucson two or three days before Juarez's disappearance, that Logan told him

6   what happened to Juarez, and that Logan informed him of his and Petitioner's activities on

7   the night Juarez disappeared. (*Id.* at 84-85, 88-89.)

8           <u>Analysis</u>

9           On direct appeal, the Arizona Supreme Court upheld the admissibility of this

10   testimony pursuant to the "invited error" doctrine. *Kemp*, 185 Ariz. at 60-61, 912 P.2d at

11   1289-90. "By asserting the non-existence of evidence connecting Kemp to the murder,

12   defense counsel cannot now claim error occurred by meeting the assertion with contrary

13   proof." *Id.* at 61, 912 P.2d at 1290. The court also held that Petitioner was not prejudiced

14   by the admission of the testimony because "[t]he only new information the jury learned, that

15   it did not already know from other sources, was that Logan made a statement about what

16   happened the night Juarez was abducted, robbed, and killed." *Id.* Given the cumulative

17   nature of the information conveyed through Logan's hearsay statements, "[a]ny error would

18   have been harmless in light of the substantial evidence of Kemp's guilt." *Id.*

19           As the Arizona Supreme Court correctly noted, defense counsel opened the door for

20   the admission of Logan's statement through his cross-examination of Detective Salgado. A

21   defendant is not entitled to relief based upon an error he invited. *See United States v. Reyes-*

22   *Alvarado*, 963 F.2d 1184, 1187 (9th Cir. 1992); *United States v. Boyd*, 86 F.3d 719, 722 (7th

23   Cir. 1996).

24           In addition, as previously noted, a state court's evidentiary rulings do not form the

25   basis for federal habeas relief unless the admission of the evidence was so prejudicial that

26   it constituted a due process violation. *See Estelle v. McGuire*, 502 U.S. at 67-68. The

27   admission of Logan's hearsay statements does not meet the standard. The information

28   conveyed by the statements was not significantly different from that in Petitioner's

1   statements to Detective Salgado.  To the extent that testimony contained new information –

2   i.e., that Logan had made statements to Detective Salgado about the events surrounding the

3   crimes – the information was of minor import in the context of the remaining evidence of

4   Petitioner's guilt.  Therefore, even if the admission of the testimony was erroneous under the

5   rules of evidence, Petitioner is not entitled to habeas relief because the evidence was not so

6   prejudicial that it resulted in a due process violation.  *Estelle v. McGuire*, 502 U.S. at 67-68.

7   Finally, the testimony did not have a "substantial and injurious effect or influence in

8   determining the jury's verdict" under *Brecht*.  507 U.S. at 637.

9        The Court likewise rejects Petitioner's contention that the admission of Logan's

10  statements entailed a violation of *Bruton.*   In *Bruton v. United States*, 391 U.S. 123, 125

11  (1968), the Supreme Court held that the admission of a co-defendant's out-of-court statement

12  naming the defendant as a participant in the crime violated a defendant's rights under the

13  Confrontation Clause.  To constitute a violation under *Bruton*, however, a co-defendant's

14  statement must "facially, expressly, clearly, or powerfully implicate[] the defendant." *United*

15  *States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001), *overruled on other grounds, United*

16  *States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc).  Here, Detective Salgado's

17  testimony regarding his contact with Logan was limited so that it did not directly implicate

18  Petitioner.  *See Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (no *Bruton* error

19  where only the fact, not the content, of the co-defendant's confession was admitted at trial,

20  and the facts from which the jury could infer that the statement might have implicated

21  petitioner came through other, properly admitted evidence); *see also Fox v. Ward*, 200 F.3d

22  1286, 1292 (10th Cir. 2000).  In any event, a *Bruton* violation does not require reversal "if

23  the other evidence of guilt was overwhelming and the prejudice to the defendant from his co-

24  defendant's admission slight by comparison."  *Herd v. Kincheloe*, 800 F.2d 1526, 1529 (9th

25  Cir. 1986) (quotation omitted).  Here, the most damaging evidence was Petitioner's own

26  admissions to corrections officers that he committed the murder.  Again, any error was

27  harmless.

28        For the reasons set forth above, Claim 4 is denied.

**Claim 5**

Petitioner alleges that his right to effective assistance of counsel was denied.  First, he contends that counsel performed ineffectively by opening the door to the introduction of co-defendant Logan's hearsay statements.  (Dkt. 80 at 29-32.)  Next, he asserts that counsel was ineffective in failing to object to several instances of prosecutorial misconduct.  (*Id.*)

Clearly established federal law

For ineffective assistance of counsel (IAC) claims, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*; *see Edwards v. Lamarque*, 475 F.3d 1121, 1124 (9th Cir. 2007) (en banc).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  In answering that question, a reviewing court necessarily considers the strength of the state's case. *See Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice").

- 20 -

1

Analysis

2     The PCR court denied relief on both aspects of Petitioner's ineffective assistance

3 claim.  As explained below, in rejecting these claims the court did not unreasonably apply

4 *Strickland*.

5     *Opening the door*

6     Petitioner claims that counsel was ineffective because he "opened the door" to

7 testimony from Detective Salgado about Logan's statements.  The PCR court rejected this

8 claim, finding that it failed to satisfy either prong of *Strickland*.  (ME 5/13/99.)  The court

9 explained that while counsel's cross-examination of Detective Salgado "was either poorly

10 worded or a calculated risk, and it resulted in unfavorable evidence to the defense . . . [i]t was

11 not so poorly worded, or such a high risk . . . as to bring defense counsel's performance

12 below an objective standard of reasonableness." (*Id.*)  Citing the Arizona Supreme Court's

13 ruling on the admissibility of the testimony, the PCR further found that Petitioner was not

14 prejudiced by counsel's performance because "there is no showing that it had any appreciable

15 effect on the outcome of the trial."  (*Id.*)

16     First, it is clear that defense counsel made a strategic decision during his cross-

17 examination of Detective Salgado to emphasize the lack of evidence connecting Petitioner

18 to the murder.  (*See* RT 6/3/90 (p.m.) at 80.)  This strategy was apparently based in part upon

19 counsel's assumption that, pursuant to the court's prior ruling, Logan's hearsay statements

20 would remain inadmissible and the State would be unable to correct the impression left with

21 the jury that no evidence connected Petitioner to the murder.[7]  (*Id.*)  The fact that the strategy

22

23          [7]      During the parties' discussion with the court, defense counsel offered the
24    following response to the prosecutor's argument that counsel had opened the door to
      evidence of Logan's statements:
25
26              I will dispute that but that is neither here nor there. The question was
              asked properly with the information based on the court's ruling.  If the State
27              wanted to object to that, that is based on the court's ruling, that's fine, they can
              do that.  They chose not to object to the questions that were proper.  That is the
28              point [the prosecutor] made, a trial strategy decision. Frankly, I am choosing

1   was not ultimately successful, and Petitioner was denied the "windfall" the strategy might

2   otherwise have produced, *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993), is not sufficient

3   to establish constitutionally deficient performance.  As the *Strickland* Court explained: "It

4   is all too tempting for a defendant to second-guess counsel's assistance after a conviction or

5   adverse sentence, and it is all too easy for a court, examining counsel's defense after it has

6   proved unsuccessful, to conclude that a particular act or omission was unreasonable." 466

7   U.S. at 689; *see Edwards v. Lamarque*, 475 F.3d at 1127-29 (state appellate court was not

8   objectively unreasonable in determining that counsel made a reasonable, tactical decision to

9   ask the questions that led to defendant's waiver of the spousal privilege).

10       In addition, as discussed above, Petitioner was not prejudiced under *Strickland* despite

11   the fact that counsel's strategy opened the door to limited testimony about Logan's

12   statements.  There was not a reasonable probability of a different verdict had the testimony

13   been precluded.

14       *Prosecutorial misconduct*

15       Petitioner contends that defense counsel rendered ineffective assistance by failing to

16   object to several instances of alleged prosecutorial misconduct.   (Dkt. 80 at 29-30.)

17   Petitioner asserts, without elaboration, that the following comments by the prosecutor during

18   closing argument constituted objectionable misconduct: informing the jury that he was

19   unable to "go into [Petitioner's] past" and that he would be happy to "fill the jury in" after

20   the trial; remarking that Petitioner had subpoena power and could have brought Logan in to

21   testify; inviting the jury to speculate about Logan's possible testimony; noting that the State

22   had not offered Petitioner a plea deal; and suggesting that the jury could conclude that

23   Petitioner had killed Juarez in Pima County because that is where the charges were brought.

24   (*Id.*)

25       The PCR court rejected these allegations because "[n]one of the issues relating to

26

27       to make a different trial strategy decision.

28

(RT 6/3/04 (p.m.) at 80.)

alleged prosecutorial misconduct rises to the level of ineffective assistance of counsel; failure to object was understandable for tactical or other reasons."  (ME 5/13/99.)

On direct appeal, the Arizona Supreme Court considered the underlying claims of prosecutorial misconduct, determined that all but one were waived due to Petitioner's failure to object at trial, and concluded that none of the waived claims involved fundamental error because the allegations were "either immaterial and non-prejudicial statements, or have been taken out of context by Kemp." *Kemp*, 185 Ariz. at 62, 912 P.2d at 1291.

The remaining allegation of misconduct referred to the prosecutor's statement that, "[Defense counsel] has gone so far as to suggest we don't even know if it happened in Pima County. You can be sure of one thing. You wouldn't hear the case, number one, and so that particular argument is simply without merit."  (RT 6/4/93 at 59.)  Defense counsel objected to the comment, but the trial court overruled the objection.  (*Id.*)  The Arizona Supreme Court found the statement "arguably improper" but "nonetheless harmless":

> Defense counsel during closing argument asserted that the State had to prove that Juarez was killed in Pima County.  However, the State only had to prove that an element of the offense, such as the kidnapping or the armed robbery, occurred in Pima County.  The State proved this, so error, if any, would be harmless.

*Kemp*, 185 Ariz. at 62, 912 P.2d at 1291 (citation omitted).

Based upon the state supreme court's analysis of the underlying prosecutorial misconduct claims – that the incidents were immaterial and harmless – Petitioner was not prejudiced by counsel's failure to object.  Petitioner does not argue that there was a reasonable probability of a different verdict if counsel had objected.[8]  His allegation of

---

[8]      This Court agrees with the Arizona Supreme Court's characterization of Petitioner's claims and its conclusion that the alleged prosecutorial misconduct did not deprive Petitioner of a fair trial.  *Kemp*, 185 Ariz. at 62, 912 P.2d at 1291.  The prosecutor's conduct did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. at 637-38); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness

prejudice is "unsupported by a statement of specific facts" and does not warrant habeas relief. *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995); *see Turner v. Calderon*, 281 F.3d 851, 878 (9th Cir. 2002) (merely listing instances of alleged ineffective assistance is insufficient to establish grounds for relief).

Petitioner also fails to satisfy *Strickland*'s deficiency prong.  Counsel did object when the prosecutor argued that venue was established merely by the fact that the charges were brought in Pima County.  With respect to the prosecutor's other comments, counsel's trial strategy with respect to objections is entitled to deference, and reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see, e.g.*, *United States v. Mejia-Mesa*, 153 F.3d 925, 931 (9th Cir. 1998) ("While [a defendant] may argue that it may have been better to make a certain objection, a few missed objections alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions (or failures to act) were pursuant to his litigation strategy and within the wide range of reasonable performance.").  For example, trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *see United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Dubria v. Smith*, 224 F.3d at 1003-04 (failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance); *see also Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir.

---

of the trial, not the culpability of the prosecutor").  The prosecutor's remarks did not manipulate or misstate the evidence, and the case against Petitioner was very strong.  *See Darden*, 477 U.S. at 181-82.

2005); *Seehan v. Iowa*, 72 F.3d 607, 610-12 (8th Cir. 1995) (en banc).

Here, defense counsel's failure to object to instances of alleged prosecutorial misconduct did not constitute ineffective assistance. Petitioner has not shown that counsel's silence was an unreasonable trial tactic and, given the strength of the case against him, he has not demonstrated that he was prejudiced by counsel's performance. Claim 5 is therefore denied.

## II.    Sentencing Stage Claims

At sentencing, Petitioner did not seek to prove the existence of any statutory mitigating factors. Through a sentencing memorandum, defense counsel advanced the following non-statutory mitigating factors: that Petitioner suffered from a personality disorder under which he perceived others as "selfish, dishonest, and opportunistic" and believed that his "only recourse is to get what [he] can for [himself]"; failed to receive requested psychological counseling during previous periods of incarceration in California and Arizona; had a record of good behavior during his previous prison terms; had a good family background and supported his mother; was a follower rather than a leader; and was convicted based on circumstantial evidence. (ROA 98.)

The court held a sentencing hearing on July 9, 1993. Petitioner did not offer any evidence or present witnesses. After the State presented its case in aggravation and the defense argued its mitigation case, Petitioner addressed the court. First, he praised and thanked his counsel. (RT 6/9/93 at 17.) He then threatened the reporters who covered the case, expressed regret for having failed to kill his co-defendant, and denigrated the victim:

> The prosecutor, in his alleged wisdom, has portrayed me as being a killer without remorse or regret. This is a wholly inaccurate assessment. I feel a deep and abiding sense of remorse at having permitted friendship to stay my hand in the face of wiser counsel; thus electing not to kill Jeff Logan at a time when both instinct and circumstances demanded his death.
>
> You can rest assured that is a lapse of judgment I will never repeat and one which I will bend all my energies towards correcting in the not too distant future. Beyond that, I regret nothing.
>
>                       . . .
>
> Make no mistake, the day will come when I return to Tucson. And on the day I will remember all the kind things certain reporters had to say about me.

- 25 -

1

2

3

> The so-called victim was not an American citizen and, therefore, was beneath my contempt.  Wetbacks are hardly an endangered species in this state.  If more of them wound up dead, the rest of them would soon learn to stay in Mexico, where they belong.

4

5

> I don't show any mercy and I am certainly not here to plead for mercy. I spit on the law and all those who serve it . . .

6 (*Id.* at 18.)

7 Defense counsel urged the court to interpret Petitioner's comments as simply "a cry

8 for the death penalty." (*Id.* at 19.)  The prosecutor asked the court to consider Petitioner's

9 remarks as rebuttal to the proffered mitigation.  (*Id.* at 20.)  The prosecutor also requested

10 that the court consider Petitioner's parole status at the time of the offenses as rebuttal

11 evidence; the court refused to do so, however, because the State had failed to file the proper

12 paperwork.  (ME 7/12/93 at 4.)

13 In sentencing Petitioner to death, the court first found that Petitioner intended to kill

14 and did kill the victim.  (*Id.* at 3.)  The court then determined that three aggravating

15 circumstances had been proved beyond a reasonable doubt:  Petitioner had been convicted

16 of a prior felony involving the use or threat of violence against another person, pursuant to

17 A.R.S. § 13-703(F)(2); he committed the offense for pecuniary gain, under (F)(5); and he

18 committed the murder in an especially cruel manner, under (F)(6).  (*Id.* at 5-7.)  The court

19 took into account the factors set forth in Petitioner's sentencing memorandum, but found no

20 mitigating factors sufficient to call for leniency.  (*Id.* at 8-9.)

21 **Claim 7**

22 Petitioner alleges that the trial court erroneously applied the "extraordinary cruelty"

23 aggravating factor.  (Dkt. 80 at 37-41. )

24 Pursuant to A.R.S. § 13-703(F)(6), it is an aggravating factor if "the defendant

25 committed the offense in an especially cruel, heinous or depraved manner."  The trial court

26 found that this factor was established because "Mr. Juarez must have undergone a

27 tremendous amount of mental anguish . . . based on the uncertainty of what his fate would

28 be" while he was transported fifteen miles from the site of his abduction to a remote area in

the desert and again while he was "walked out into the desert approximately 100 to 200 feet from where the vehicle was parked and disrobed before being shot."  (ME 7/9/93 at 6.)

Analysis

On direct appeal, the Arizona Supreme Court upheld the trial court's finding that the murder was "especially cruel":

> Kemp argues that the trial court erred in finding that the murder was committed in an especially cruel manner. A.R.S. § 13-703(F)(6).  Evidence about "[a] victim's certainty or uncertainty as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies,* 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984).
>
> The evidence supports the finding.  Juarez was abducted from the parking area of his apartment complex.  His body was discovered approximately 100 feet off a dirt road in the desert north of Tucson.  At some point, after his abduction, Juarez provided Kemp with his personal identification number.  Two spent bullet casings were found in the area around his body.  He died of two gunshot wounds to the back of the head.  Kemp on two occasions admitted the killing.
>
> The only reasonable inference from these facts is that Juarez suffered incredible terror from the moment of his abduction until his murder.  Once Logan and Kemp had taken him about fifteen miles north of Tucson, Juarez must have experienced great and terrible uncertainty about his fate.  The evidence indicates that Kemp must have led Juarez at gunpoint from the truck to the place where the killing occurred.  Once he was forced away from the truck and forced to disrobe, he must have known that his murder was imminent. . . . The cruelty finding is proper.

*Kemp*, 185 Ariz. at 64-65, 912 P.2d 1293-94.

Habeas review of a state court's application of an aggravating factor "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. at 780.  In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id*. at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Based upon the evidence outlined by the state courts, a rational factfinder could have determined that the victim suffered the requisite level of uncertainty as to his fate and that Petitioner would reasonably have foreseen the victim's suffering. *See, e.g.*, *State v. Van*

- 27 -

*Adams*, 194 Ariz. 408, 421, 984 P.2d 16, 29 (1999).   Notwithstanding Petitioner's conjectures to the contrary, a reasonable factfinder could have determined that the victim was killed in the location where his body was found, and that prior to the shooting, while he was being abducted, driven to the location, walked away from the vehicle, and disrobed, the victim experienced significant mental anguish.

Because the Arizona Supreme Court's holding with respect to the (F)(6) factor was not arbitrary or capricious, Petitioner is not entitled to relief on Claim 7.

**Claim 8**

Petitioner challenges the constitutionality of the "pecuniary gain" factor, arguing that in felony murder cases it repeats an element of the underlying robbery offense and thus fails to genuinely narrow the class of death-eligible defendants.  (Dkt. 80 at 44-46.)  He also alleges that the trial court erred when it determined that the factor had been proven in his case.  (*Id.* at 42-44.)

Arizona law provides that it is an aggravating factor if "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-703(F)(5).  The trial court found that the pecuniary gain factor was proved by the fact that Petitioner purchased the gun used to kill the victim a day or two prior to the murder and that, as established by the photographic evidence, less than an hour after the abduction Petitioner used the victim's ATM card to withdraw $200.  (ME 7/9/93 at 5-6.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's challenges to the (F)(5) factor:

> Kemp argues that this factor is unconstitutional as applied here because it repeats an element of the underlying crime of felony murder.  Kemp also argues the finding is not supported by the evidence.  We disagree with both contentions.
>
> Kemp first challenges the constitutionality of the (F)(5) factor, asserting that any homicide occurring in the course of an armed robbery will also support a finding that the murder was committed for pecuniary gain.  We have previously rejected this argument.  In any event, Juarez's killing in the course of the kidnapping is first degree felony murder, wholly apart from the armed robbery conviction. A.R.S. § 13-1105.  Thus, Kemp's argument is irrelevant

1   to the constitutionality of the pecuniary gain finding in this case.

2       Second, the evidence supports the finding in this case. Kemp purchased
    the murder weapon the day before the murder. Juarez's ATM card was used
3   almost immediately after his abduction and before his murder. Kemp
    committed the armed robbery, kidnapping, and murder with the expectation of
4   receiving something of pecuniary value. The finding is proper.

5   *Kemp*, 185 Ariz. at 65, 912 P.2d at 1294 (citations omitted).

6   <u>Analysis</u>

7   *Constitutionality of (F)(5)*

8       Petitioner's challenge to the constitutionality of the (F)(5) factor is without merit.

9   First, as the Arizona Supreme Court noted, in addition to armed robbery, Petitioner was

10  convicted of the underlying offense of kidnapping. The "pecuniary gain" factor does not

11  repeat an element of kidnapping; therefore, Petitioner's double-counting arguments fails.

12      In addition, with respect to the class of felony murders based on the underlying

13  offense of robbery, Petitioner's arguments are disposed of by the Ninth Circuit's holding in

14  *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). In *Woratzeck,* the court applied the

15  principles set forth in *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988), to conclude that

16  "[f]actor (F)(5) sufficiently channels the sentencer's discretion and does not result in

17  unconstitutionally disproportionate imposition of the death penalty when applied to felony-

18  murder defendants." In reaching this conclusion, the court expressly rejected arguments

19  identical to those raised by Petitioner. 97 F.3d at 334-35. First, the court explained that the

20  pecuniary gain factor is constitutionally permissible because it "is not automatically

21  applicable to someone convicted of robbery felony-murder" and therefore "serves to narrow

22  the class of death-eligible persons sufficiently." *Id.* at 334. Next, citing *State v. Greenway*,

23  170 Ariz. 155, 164, 823 P.2d 22, 31 (1991), the court stated that the pecuniary gain factor

24  does not result in double-counting between the elements of a felony murder charge and the

25  pecuniary gain factor because not every felony murder that occurs in the course of a robbery

26  is motivated by pecuniary gain; therefore, the motivation of pecuniary gain must be proven

27  as a fact in addition to the elements of the underlying crime. *Id.* Finally, the court

28  considered the argument that application of the pecuniary gain factor to a felony-murder

- 29 -

1   charge results in an overbroad and arbitrary imposition of the death penalty. *Id.* at 335. The

2   Ninth Circuit rejected this argument with the following observation:

> That someone who intentionally kills might not be sentenced to death in
> Arizona does not mean that Woratzeck's death sentence is unconstitutional. If
> an intentional killing is done for pecuniary gain, then death is also a permitted
> penalty. Woratzeck's first-degree felony-murder conviction is treated no
> differently from any first-degree conviction for intentional killing and neither
> crime alone can result in death absent a finding of one or more aggravating
> circumstances. The State of Arizona could rationally conclude that a
> defendant's motive to murder more accurately reflects his relative culpability
> than whether the murder is done with an affirmative intent to kill or "merely"
> an utter disregard for whether the victim lives or dies.

9   *Id.*

10   The Arizona Supreme Court's rejection of Petitioner's constitutional challenges to the

11   pecuniary gain factor was neither contrary to nor an unreasonable application of federal law.

12   *Sufficiency of evidence*

13   Petitioner contends that there was insufficient evidence to show that the murder was

14   committed for pecuniary gain. Specifically, he asserts that the photographic evidence is

15   insufficient to prove beyond a reasonable doubt that he was the person shown using the

16   victim's bank card. (Dkt. 80 at 43.) As stated above, this Court must determine "whether,

17   after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

18   of fact could have found that the factor had been satisfied." *Lewis v. Jeffers*, 497 U.S. at 781

19   (quoting *Jackson v. Virginia*, 443 U.S. at 319).

20   "[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-

21   703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the

22   murder, not merely the result of the murder." *Moorman*, 426 F.3d at 1054. Based upon the

23   facts proven at the trial, a rational factfinder readily could have determined that Petitioner

24   murdered Juarez in the expectation of pecuniary gain. *See Correll v. Stewart*, 137 F.3d 1404,

25   1420 (9th Cir. 1998); *Woratzeck*, 97 F.3d at 336. The pecuniary motivation behind the

26   offense is supported by the fact that immediately following the abduction and murder,

27   Petitioner successfully withdrew cash using the victim's ATM card, indicating that prior to

28   shooting Juarez, Petitioner had obtained his PIN number. Finally, while Petitioner is critical

1   of the trial court's determination that the individual in the photograph was Petitioner, under

2   28 U.S.C. § 2254(e)(1) that finding is presumed correct, and Petitioner has done nothing to

3   meet his burden of rebutting that presumption with clear and convincing evidence.

4          For the reasons discussed above, Petitioner is not entitled to relief on Claim 8.

5   **Claim 9**

6          Petitioner alleges that the sentencing court violated his confrontation rights by relying

7   on information outside the record in imposing the death sentence.   (Dkt. 80 at 46-48.)

8   Specifically, Petitioner contends that the trial court's finding that the victim had been walked

9   100 to 200 feet into the desert and disrobed before being shot was based on facts contained

10  in the presentence report and in the State's sentencing memorandum rather than evidence

11  presented at trial.  (*Id.* at 47.)

12         Analysis

13         The Arizona Supreme Court rejected this claim on direct appeal, determining that the

14  trial court's review of the presentence report did not prejudice Petitioner:

15         . . . [O]ur review of the special verdict indicates that the trial judge only
       specifically relied upon the presentence report, which is not part of the record,
16     in two instances.  First, he relied on it in part to find that Kemp had previously
       been convicted of a crime of violence.  But Kemp stipulated to the fact of his
17     prior California robbery conviction.  Second, the trial judge indicated he relied
       upon it as a possible source of mitigation.  While evidence in support of
18     aggravation must be admissible under the rules of evidence, evidence in
       support of mitigation does not.  A.R.S. § 13-703(C).  Kemp does not allege
19     that he suffered prejudice from this reliance.

20  *Kemp*, 185 Ariz. at 66, 912 P.2d at 1295.

21         As the supreme court noted, *id.*, notwithstanding the information contained in the

22  presentence report and the State's sentencing memorandum, the evidence presented at trial

23  fully supported the trial court's findings concerning the circumstances of the murder.  While

24  the medical examiner could not determine where the shooting took place (RT 6/4/93 at 18),

25  the evidence proved that the victim's badly decomposed and unclothed body was found in

26  the desert within ten feet of two spent .380 shells (RT 6/4/93 at 12; RT 6/3/94 (a.m.) at 56-

27  57).  The body's distance from the roadway – whether fifty to seventy feet, as stipulated at

28  trial (RT 6/3/94 (p.m.) at 92), or 100 to 200 feet, as the court stated at sentencing (ME

1   7/12/93 at 6) – is immaterial to the finding that the victim suffered mental anguish prior to

2   his death.  Petitioner is not entitled to relief on Claim 9.

3   **Claim 10**

4   Petitioner alleges that the trial court failed to give adequate consideration to all of the

5   mitigation evidence proffered at sentencing and failed to weigh the information

6   "collectively." (Dkt. 80 at 48-54.)

7   Background

8   After conducting the sentencing hearing, the trial judge noted that both parties had the

9   opportunity to present evidence and argument on the existence or non-existence of

10  aggravating and mitigating circumstances pursuant to A.R.S. § 13-703(F) and (G), and that

11  "[b]oth parties were given the opportunity to present any other relevant mitigation for the

12  Court's consideration."  (ME 7/9/93 at 4.)  The court stated that it had considered all of the

13  statutory mitigating factors as well as the non-statutory mitigating factors set forth in the

14  defendant's sentencing memorandum.  (*Id.* at 7-8.)  With respect to non-statutory mitigation,

15  the court noted:

16          The Court has considered the non-statutory mitigating factors set forth
            in the defendant's sentencing memorandum and also as set forth on the record
17          here this morning. And they are identified as personality disorders, the
            defendant's prior record, good behavior while incarcerated, good family
18          background, the defendant being characterized as a follower.

19          The Court has taken these factors into consideration in light of the
            information contained in the presentence report and in light of the defendant's
20          statements to the Court this morning, and finds that none of those factors
            constitutes a mitigating factor sufficient to call for leniency.
21
            The Court will further state for the record that if any of these factors
22          that the Court has considered would rise to the stature of a mitigating factor,
            the Court does not feel that they are sufficient to call for leniency in the case.
23
            The Court will state for the record, in light of the fact that the Court has
24          found no mitigation in the case, that any one of the three aggravating
            circumstances found to be true by the Court beyond a reasonable doubt would
25          result in the Court's imposition of the death penalty.

26  (*Id.* at 8-9.)

27  On direct review, the Arizona Supreme Court rejected Petitioner's challenge to the

28  trial court's handling of the mitigation evidence:

The court found that Kemp did not prove the existence of any mitigation. We agree.

The court went on to state that even if the defendant had proved the existence of mitigation, any one of the aggravating factors it found were independently sufficient to call for the death penalty. Kemp argues that this finding makes clear that the trial judge did not consider his mitigation. We disagree. This finding indicates that the trial judge did consider the evidence Kemp offered for mitigation; he found that anything Kemp offered, even if proved, would not have been sufficiently substantial to call for leniency.

Kemp complains that the trial judge relied upon a sentencing order prepared in advance and delivered at the conclusion of the hearing. We find no merit to his argument that this indicates a failure to consider Kemp's proffered mitigation. Kemp also argues that the weighing process was faulty, apparently because he disagrees with the weight given to each mitigating factor. Our review of the record indicates that the trial judge properly determined that there was no mitigation, or alternatively, no mitigation sufficiently substantial to call for leniency.

*Kemp*, 185 Ariz. at 66, 912 P.2d at 1295.

<u>Analysis</u>

Under the federal constitution, in capital sentencing proceedings the sentencer must not be precluded by any legal barrier from considering relevant mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586 (1978). In *Lockett* and subsequently in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14; *see Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (courts may not condition consideration of a mitigating factor on a causal connection between the factor and the offense). However, while the sentencer must not be foreclosed from considering relevant mitigation information, "it is free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence"); *State v. Newell*, 212 Ariz. 389, 405, 133 P.3d 833, 849 (2006) (failure to establish a causal connection between the mitigating factor and the crime may be considered in assessing the quality and strength of the mitigating evidence).

On habeas review, the federal court does not evaluate the substance of each piece of

1    evidence submitted as mitigation; rather, it reviews the record to ensure that the state court

2    allowed and considered all relevant mitigation.  *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th

3    Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial

4    court is not required to discuss each piece of such evidence).  As the Ninth Circuit has noted,

5    "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing

6    federal court can discern from the record that the state court did indeed consider all

7    mitigating evidence offered by the defendant.'" *Moormann v. Schriro*, 426 F.3d 1044, 1055

8    (9th Cir. 2005) (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see Parker v.*

9    *Dugger*, 498 U.S. 308, 314-15, 318 (1991) (sentencing court properly considered all

10   information, including nonstatutory mitigation, where the court stated that it considered all

11   the evidence and found no mitigating circumstances that outweighed the aggravating

12   circumstances); *Lopez v. Schriro*, 491 F.3d 1029, 1037-38 (9th Cir. 2007) (sentencing court

13   is presumed to know and follow the law); *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir.

14   1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997); *Poland v. Stewart*, 117

15   F.3d 1094, 1101 (9th Cir. 1997).

16        Based upon these principles, Claim 10 is without merit.  As the Arizona Supreme

17   Court noted, the trial court considered all of the mitigation information.  On habeas review,

18   this Court "may not engage in speculation as to whether the trial court actually considered

19   all the mitigating evidence; we must rely on its statement that it did so." *Moormann*, 426

20   F.3d at 1055.  There is a clear distinction between "a failure to consider relevant evidence

21   and a conclusion that such evidence was not mitigating"; the latter determination does not

22   implicate the Constitution. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).

23        Moreover, the Arizona Supreme Court conducted a separate, independent review of

24   the aggravating and mitigating factors and determined that Petitioner's death sentence was

25   appropriate. *Kemp*, 185 Ariz. at 66-67, 912 P.2d at 1295-96.  Even if the trial court had

26   committed constitutional error at sentencing, a proper and independent review of the

27   mitigation and aggravation by the Arizona Supreme Court cured any such defect. *See*

28   *Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able

1    to fully consider mitigating evidence and are constitutionally permitted to affirm a death

2    sentence based on independent re-weighing despite any error at sentencing).  Claim 10 is

3    denied.

4        **Claim 11**

5        Petitioner alleges that his fair-trial rights were violated when defense counsel

6    stipulated to the introduction of a prior conviction at sentencing without a knowing waiver.

7    (Dkt. 80 at 54-56.)  He further asserts that his confrontation rights were violated because he

8    was denied the opportunity to personally contest the stipulation or the identification.  (*Id.* at

9    55-56.)  This claim is meritless.

10       At sentencing, the prosecutor offered documents relating to "certain stipulations or

11   agreements that we have with the defense."  (RT 7/9/93 at 10.)  Among the materials was a

12   "pen pack" indicating that Petitioner had been convicted of robbery in California in 1978.

13   The prosecutor then explained to the court:

14           I believe that Mr. Larsen [defense counsel] will agree with me that it is
             not disputed that, in fact, the paperwork that I have relates to Mr. Kemp.
15           There are fingerprints that could be utilized to demonstrate that.  I think we
             have an agreement that this relates to Mr. Kemp and, indeed, he was convicted
16           of this robbery back in 1978.

17   (*Id.* at 10-11.)  Defense counsel responded, "That's correct, Your Honor."  (*Id.* at 11.)

18       The Arizona Supreme Court found that Petitioner had "stipulated to his previous

19   conviction."  *Kemp*, 185 Ariz. at 63, 912 P.2d at 1292.  The court also found that the

20   conviction satisfied A.R.S. § 13-703(F)(2), which provided that a prior conviction for a

21   violent felony constituted an aggravating factor.  *Id.* at 64, 912 P.2d at 1293.

22       Analysis

23       As an initial matter, the record does not demonstrate that the stipulation was entered

24   without Petitioner's consent; to the contrary, he was present when the stipulation was entered

25   and voiced no objection.  More significantly, Petitioner has failed to show that he was

26   prejudiced by the stipulation.  He does not argue that, absent the stipulation, the State would

27   have been unable to establish the prior conviction. *Cf. State v. West*, 176 Ariz. 432, 447, 862

28   P.2d 192, 207 (1993) (defense counsel's stipulation to prior violent felony that "the state

- 35 -

1    could easily have proved" did not constitute an exceptional circumstance requiring

2    defendant's consent).  He does not contend that the conviction failed to satisfy the criteria

3    under § 13-703(F)(2) – although the stipulation did not prevent trial counsel from making

4    such an argument at sentencing.  (RT 7/9/93 at 13-14.)  Finally, he does not explain how

5    "personally contesting" the prior conviction could alter the state courts' findings with respect

6    to the (F)(2) factor.  Claim 11 is denied.

7    **Claim 16**

8    Petitioner alleges that he was denied the "procedural safeguard" of proportionality

9    review of his death sentence.  (Dkt. 80 at 59-63.)  The Arizona Supreme Court abandoned

10   proportionality review prior to Petitioner's appeal, *State v. Salazar*, 173 Ariz. 399, 844 P.2d

11   566 (1992), and the United States Supreme Court has held that proportionality review is not

12   required, *Walton*, 497 U.S. at 655-56; *Pulley v. Harris*, 465 U.S. 37, 43-46 (1984).  Because

13   the Arizona Supreme Court's rejection of this claim, *Kemp*, 185 Ariz. at 67, 912 P.2d at

14   1296, was neither contrary to nor an unreasonable application of clearly established federal

15   law, Petitioner is not entitled to relief on Claim 16.

16   **CERTIFICATE OF APPEALABILITY**

17   In the event Petitioner appeals from this Court's judgment, the Court on its own

18   initiative has evaluated the claims within the petition for suitability for the issuance of a

19   certificate of appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-

20   65.

21   Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

22   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

23   certificate of appealability ("COA") or state the reasons why such a certificate should not

24   issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

25   made a substantial showing of the denial of a constitutional right."  This showing can be

26   established by demonstrating that "reasonable jurists could debate whether (or, for that

27   matter, agree that) the petition should have been resolved in a different manner" or that the

28   issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529

1  U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For

2  procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the

3  petition states a valid claim of the denial of a constitutional right and (2) whether the court's

4  procedural ruling was correct.  *Id.*

5       The Court finds that reasonable jurists, applying the deferential standard of review set

6  forth in the AEDPA, which requires this Court to evaluate state court decisions in light of

7  clearly established federal law as determined by the United States Supreme Court, could not

8  debate its resolution of the merits of Petitioner's claims as set forth in this Order and its

9  Order of September 17, 2007 (Dkt. 112).  Further, for the reasons stated in the Court's Order

10  regarding the procedural status of Petitioner's claims filed on April 25, 2005 (Dkt. 78), the

11  Court declines to issue a COA with respect to any claims that were found to be procedurally

12  barred.

## CONCLUSION

14       For the reasons set forth above, Petitioner is not entitled to habeas relief.

15       Accordingly,

16       **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

17  (Dkt. 19) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

18       **IT IS FURTHER ORDERED** vacating the stay of execution issued by this Court on

19  January 24, 2000.

20       **IT IS FURTHER ORDERED DENYING** a Certificate of Appealability.

21       **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

22  to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

23  AZ 85007-3329.

24       DATED this 11th day of September, 2008.

25  **Copies sent to Rachelle Resnick
9/11/08 mm**

FRANK R. ZAPATA
United States District Judge